## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| Michael Duffy, on behalf of himself and all others similarly situated, | Civil Action No.:   4:19-cv-1189 |
| Plaintiff, | |
| vs. | |
| Anheuser-Busch Companies, LLC, | |
| Defendant. | CLASS ACTION |

## <u>COMPLAINT</u>

Plaintiff Michael Duffy, by and through his attorneys, on behalf of himself and all others similarly situated, based on personal knowledge with respect to his own circumstances and based upon information and belief pursuant to the investigation of his counsel as to all other allegations, alleges the following.

## <u>INTRODUCTION</u>

1.      This is a class action against Anheuser-Busch Companies, LLC ("A-B") concerning its failure to pay benefits under the Anheuser-Busch Companies Pension Plan (the "Plan") in amounts that are actuarially equivalent to a single life annuity, as required by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA").  By not offering benefits that are actuarially equivalent to a single life annuity, A-B is causing retirees to lose part of their vested retirement benefits in violation of ERISA § 203(a), 29 U.S.C. § 1053(a).

2.      Participants in the Plan accrue pension benefits in the form of a single life annuity ("SLA") while they work for A-B, a payment stream that starts when they retire and ends when they die.  When they retire, participants can receive their retirement benefits as a SLA or in other

forms, including a joint and survivor annuity ("JSA"), which provides an annuity during the participant's life and then an equal or reduced annuity to the participant's spouse after the participant's death, or a certain-and-life annuity ("CLA"), which provide a participant (and a beneficiary) benefits for the life of the participant but at least for a specified number of years, regardless of how long the participant lives. ERISA requires that these forms of benefit be "actuarially equivalent" to an SLA, meaning that the present value of the payment streams must be equal. *See* 29 U.S.C. § 1055(d)(1)(B) and (2)(A)(ii).

3.    To calculate the present value of the various JSAs and CLAs offered under the Plan, A-B applies actuarial assumptions. These assumptions are based on a set of mortality tables and interest rates. The mortality table and interest rate together are used to calculate a "conversion factor" which is used to determine equivalence between the SLA and the optional benefit. The present value of the SLA must equal the present value of the optional benefit for the two forms of payment to be "actuarially equivalent."

4.    Mortality rates have generally improved over time with advances in medicine and better collective lifestyle habits. People who retired recently are expected to live longer than those who retired in previous generations. Older morality tables predict that people will die at a faster rate than current mortality tables. As a result, using an older mortality table to calculate a conversion factor decreases the present value of the optional benefit forms and—interest rates being equal—the monthly payment retirees receive under those benefit forms.

5.    A-B calculates the conversion factor (and thus the values of the JSAs and CLAs using the 1984 Unisex Pension mortality table ("UP-84"). The UP-84 table was published in

1976, and was based on data from 1965-1970.[1]  Although the UP-84 table attempted to account for likely increases in life expectancy in each of the years between its date of publication and 1984 by extrapolating from increases in life expectancy for the period from 1957-1967, these projections ended up understating actual improvements in life expectancy from 1976-1984.[2]

6.      Defendant's use of the UP-84 table depresses the present values of the JSAs and CLAs offered under the Plan, resulting in benefits that are not actuarially equivalent to the SLA; rather, benefits under the JSAs and CLAs are materially **lower** than they would be if the Plan used reasonable, current actuarial assumptions.  A-B uses outdated actuarial assumptions to pay benefits under the Plan even though it uses current, updated assumptions to calculate the benefits A-B expects to pay retirees.

7.      By using outdated mortality assumptions, A-B caused Plaintiff, who worked for A-B for over 17 years, to forfeit part of his retirement benefits in violation of ERISA.  This improper reduction causes Plaintiff to receive less each month than he should, reducing the present value of his benefits by more than $4,300.

8.      Accordingly, Plaintiff seeks an Order from the Court reforming the Plan to conform to ERISA, payment of future benefits in accordance with the reformed Plan and, as required under ERISA, payment of amounts improperly withheld, and such other relief as the Court determines to be just and equitable.

---

[1]      Paul Jackson & William Fellers, The UP-1984 – A "Unisex" Mortality Table For Non-Insured Pension Plans, at 37 Table 10 (Aug. 26, 1976), available at https://www.actuaries.org/IACA/Colloquia/Sydney1976/Vol_1/Jackson_Fellers.pdf (last viewed April 1, 2019).

[2]      *See* Society of Actuaries, San Francisco Annual Meeting, Session 39PD, at 2 (Record, Vol. 25, No. 3, Oct. 17-20, 1999).

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

10.     This Court has personal jurisdiction over A-B because it is headquartered and transact business in, or resides in, and has significant contacts with, this District, and because ERISA provides for nationwide service of process.

11.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and A-B resides and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because A-B does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiff

12.     Plaintiff Michael Duffy is a resident of St. Petersburg, Florida, and a Participant in the Plan.  Mr. Duffy worked for Busch Entertainment Corporation from 1992 through 2009. He started receiving retirement benefits under the Plan on January 1, 2018, when he was 65. Mr. Duffy is receiving a joint and survivor annuity.

### Defendants

13.     Defendant A-B is an American brewing company headquartered in St. Louis, Missouri.  A-B is a subsidiary of Anheuser-Busch InBev SA/NV. A-B is the sponsor of the Plan. A-B is the Plan Administrator.

## APPLICABLE ERISA REQUIREMENTS

### *Benefit Options*

14.     ERISA requires that benefits from a defined benefit plan be paid to married participants in the form of a qualified joint and survivor annuity (a "QJSA") unless the participant, with the consent of his or her spouse, elects an alternative form of payment, making the QJSA the default benefit for employees who are married.  *See* ERISA § 205(a) and (b), 29 U.S.C. § 1055(a) and (b).

15.     A QJSA is an annuity for the life of the plan participant with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable during the joint lives of the participant and the spouse.  *See* ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1).  For example, if a plan participant receives $1,000 per month under a 50% joint and survivor annuity, the spouse will receive $500 a month for the rest of the spouse's life after the participant's death.

16.     For unmarried participants, the QJSA is an SLA.  *See* 26 C.F.R. § 1.401(a)-20, Q&A 25.

17.     Pension plans may also offer participants alternative forms of survivor annuities, known as qualified optional survivor annuities ("QOSA"). See ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2); see also 26 U.S.C. § 417(g).  A common forms of a QOSA is a CLA.

18.     ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA").  ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2).  A QPSA is an annuity for the life of the participant's surviving spouse (i.e. a beneficiary) if the participant dies before reaching the plan's normal retirement age.  *See* ERISA § 205(e), 29 U.S.C. § 1055(e)

### *Benefit Options Must Be Actuarially Equivalent*

19.     A QJSA must be actuarially equivalent to a single life annuity ("SLA"). See 29 U.S.C. § 1055(d)(1); 26 U.S.C. § 417(b).

20.     The Treasury regulations for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)), similarly provide that a QJSA "must be at least the actuarial equivalence of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan."[3] Indeed, a QJSA "must be at least as valuable as any other optional form of benefit under the plan at the same time."  26 C.F.R. § 1.401(a)-20 Q&A 16.

21.     Both ERISA and the Tax Code require that a QOSA be actuarially equivalent to an SLA.  *See* 29 U.S.C. § 1055(d)(2); 26 U.S.C. § 417(g).

22.     A QPSA must be actuarially equivalent to what the surviving spouse would have received under the plan's QJSA and any QOSAs. *See* ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

23.     ERISA does not require that pension plans offer lump sum distributions of vested benefits to retirees upon their retirement.  *See* ERISA § 205(g), 29 U.S.C. § 1055(g). However, if plans offer a lump sum distribution as an optional benefit, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires that the present value of the lump sum be determined using the applicable mortality table (the "Treasury Mortality Table")[4] and applicable interest rate (the "Treasury

---

[3]     26 C.F.R. § 1.401(a)-11(b)(ii)(2). The term "life annuity" includes annuities with terms certain in addition to single life annuities. As the Treasury regulations explain, "[t]he term 'life annuity' means an annuity that provides retirement payments and requires that survival of the participant or his spouse as one of the conditions for payment or possible payment under the annuity.  For example, annuities that make payments for 10 years or until death, whichever occurs first or whichever occurs last, are life annuities."  26 C.F.R. § 1.401(a)-11(b)(1)(i)

[4]     26 C.F.R. § 1430(h)(2)-1

Interest Rate")[5] (collectively, the "Treasury Assumptions"), which are set by the Secretary of the Treasury (the "Secretary") pursuant to IRC §§ 417(e) and 430(h) which are based on current market rates and mortality assumptions.  *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h).   In other words, the lump sum distribution must be at least the actuarially equivalent of the QOSA, QJSA and QPSA.

24.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable. ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), provides that if an employee's accrued benefit is in the form other than an SLA, the accrued benefit "shall be the actuarial equivalent" of an SLA.

25.     The Treasury regulation for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable."  26 C.F.R. § 1.411(a)-4(a).

### *Reasonable Factors Must be Used When Calculating Actuarial Equivalence*

26.     "Two modes of payment are actuarially equivalent when their present values are *equal* under a given set of assumptions." *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added).[6] Actuarial equivalence should be "cost-neutral," meaning that neither the Plan nor the participants should be better or worse off if the participant selects either the normal retirement benefit or an optional form of benefit. *See Osberg v. Foot Locker, Inc.*, 138 F.Supp.3d 517, 540 (S.D.N.Y. 2015).

27.     Under ERISA, "present value" means "the value adjusted to reflect anticipated events."  Such adjustments shall conform to such regulations as the Secretary of the Treasury may

---

[5]     26 C.F.R. § 1430(3)-1
[6]     "Equivalent" means "equal." https://www.merriam-webster.com/dictionary/equivalent
"Equal" means the "same." https://www.merriam-webster.com/dictionary/equal

prescribe." ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has prescribed numerous regulations describing how present value should reasonably reflect anticipated events, including:

(a)     The Treasury regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied *reasonable actuarial factors*, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

(b)     A plan must determine optional benefits using "a single set of *interest and mortality assumptions that are reasonable* . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

(c)     With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using *reasonable actuarial assumptions* . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

## SUBSTANTIVE ALLEGATIONS

## I.     THE PLAN

28.     A-B established the Plan to provide retirement benefits to eligible employees.  A-B sponsors the Plan and is the Plan Administrator.

29.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(a)(A).

30.     The Plan is a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

31.     The Plan is comprised of five sub-plans: (1) the Anheuser-Busch Salaried Employees' Pension Plan (the "SEPP Sub-Plan"); (2) the St. Louis National Baseball Club, Inc. Pension Plan (the "BAS Sub-Plan"); (3) the Retirement Plan for Hourly Employees of Busch

Entertainment Corporation Retirement Plan (the "BEC Sub-Plan"); (4) the Mancar Pension Plan (the "Mancar Sub-Plan"); and (5) the Campbell Taggart Retirement Plan (the "CTI Sub-Plan") (collectively the "Sub-Plans").  Mr. Duffy is a participant in the BEC Sub-Plan.

32.     Under each of the Sub-Plans, participants earn benefits in the form of an SLA based on their compensation and how many years they worked for A-B.  In addition to the SLA, the Sub-Plans offer the following forms of benefits:

        a.     The SEPP Sub-Plan: a 66 and 2/3% JSA, a five-year CLA ("5YCLA") and a ten-year CLA ("10YCLA");

        b.     The BAS Sub-Plan: a 66 and 2/3% JSA and a 5YCLA;

        c.     The BEC Sub-Plan: a 50% JSA, 75% JSA and a 10YCLA;

        d.     The Mancar Sub-Plan: a 50% JSA and a 10YCLA; and

        e.     The CTI Sub-Plan: a 50%, 75% and 100% JSA and 10YCLA.[7]

33.     Participants receiving a JSA or a CLA under the SEPP Sub-Plan, the BAS Sub-Plan, BEC Sub-Plan, and the Mancar Sub-Plan have their benefits calculated using the UP-84 mortality table and a 6.5% interest rate.

34.     Participants receiving a JSA or CLA under the CTI Sub-Plan have their benefits calculated using the UP-84 mortality table and a 7% interest rate.

---

[7]     The QJSA for the CTI Sub-Plan is the 50% JSA.  The 75% JSA and the 100% JSA are QOPAs under ERISA § 205(d)(2) which, like the QJSA, must be "the actuarial equivalent of a single annuity for the life of a participant."

II.    **The JSAs and CLAs Are Not Actuarially Equivalent to the SLA Participants Earn Under the Plan.**

A.    **Converting a SLA to a JSA or a CLA.**

35.    As set forth above, ERISA requires that a QJSA, a QPSA and QOSAs be the "actuarial equivalent" of an SLA.  *See* ERISA §§ 205(d)(1) and (2), 29 U.S.C. § 1055(d)(1) and (2).

36.    To convert a SLA retiree's normal form of benefit into a JSA or a CLA, the present value of the aggregate (i.e. the total) future benefits that the participant (and, if applicable, the beneficiary) is expected to receive must be determined.[8] The present values are then compared to determine the conversion factor.   There are two main components of these present value calculations: an interest rate and a mortality table.

37.    An interest rate is used to determine the present value of each future payment.  This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns.  The rate that is used is often called a "discount rate" because it discounts the value of a future payment.

38.    As discussed above, the interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions, which "reflect anticipated events." *See* 29 U.S.C. § 1002(27).  The interest rate may be broken into segments of short-term, medium-term, and long-term expectations pertaining to each future payment. *See* e.g. 29 U.S.C. §§ 1055(g)(3)(B)(iii), 1083(h)(2).

39.    A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

---

[8]    The conversion factor is easily calculated by a computer model.  Defendants simply input the assumptions and the model instantaneously calculates the conversion factor.

40.     More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The Society of Actuaries ("SOA"), an independent actuarial group, publishes the mortality tables that are the most widely-used by defined benefit plans when doing these conversions. The SOA published mortality tables in 1971 (the "1971 GAM"), 1983 (the "1983 GAM"), 1984 (the "UP-84"), 1994 (the "1994 GAR"), 2000 (the "RP-2000"), and 2014 ("RP-2014") to account for changes to a population's mortality experience.

41.     Since at least the 1980s, the life expectancies in mortality tables have steadily improved as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1.  According to this paper, there have been "increasing life expectancies over time" and just moving from the 2000 mortality table to the 2014 table would increase pension liabilities by 7%.

42.     Pursuant to Actuarial Standard of Practice No. 35, para. 3.5.3 of the Actuarial Standards Board,[9] actuarial tables must be adjusted on an ongoing basis to reflect improvements in mortality.[10]

43.     Accordingly, in the years between the publication of a new mortality table, mortality rates are often "projected" to future years to account for expected improvements in mortality.  For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality (the "2017 Treasury Mortality Table"). *See* IRS Notice 2016-50.[11]  In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014 (the "2018 Treasury Mortality Table"). *See* IRS Notice 2017-60.[12]

44.     For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events." 29 U.S.C. § 1002 (27). The Treasury Mortality Tables are updated and reasonable. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).

45.     Using the selected interest rate and mortality table, the present value of a SLA and a JSA or CLA can be compared to determine whether the amount of the JSA or SLA is actuarially equivalent to the SLA.

---

[9]      Courts look to professional actuarial standards as part of this analysis. *See, e.g., Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1–24–91 (1991)).

[10]Available  at:  http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement

[11]      Available at: https://www.irs.gov/pub/irs-drop/n-16-50.pdf

[12]      Available at: https://www.irs.gov/pub/irs-drop/n-17-60.pdf

46.     Changes to interest rates or mortality assumptions can have dramatic effects on the conversion factor and the value of a JSA or CLA.  Using an antiquated mortality table generates lower present values of future payments, and the amount of the monthly benefit under a JSA or a CLA decreases.

47.     As discussed, plans must use reasonable interest rates and reasonable mortality tables to evaluate whether the present values of benefit options produce equivalent benefits for participants and beneficiaries.

**B.     The Plan Does Not Use Reasonable Actuarial Factors for Participants Who Receive an Alternative Annuity Benefit.**

48.     The SEPP Sub-Plan, the BAS Sub-Plan, BEC Sub-Plan, and the Mancar Sub-Plan each use the UP-84 table and a 6.5% interest rate to convert the SLA that participants earned as a retirement benefit to a JSA or a CLA.  The CTI Sub-Plan uses the UP-84 table and a 7% interest rate.

49.     Using the UP-84 table to calculate actuarially equivalent benefits is unreasonable because it is severely outdated and does not "reflect anticipated events" (i.e. the anticipated mortality rates of participants).

50.     The UP-84 table is roughly 35 years out of date, and as such they overstate mortality rates. According to the Centers for Disease Control and Prevention, in 1984, a 65-year-old had an average life expectancy of 16.8 years in 1984).[13] In 2010, a 65-year-old had a 19.1-year life expectancy, a 13% increase, which would result in an additional 28 months of annuity payments. Accordingly, by 2010, the average employee would have expected to receive, and the average

---

[13]     *See* https://www.cdc.gov/nchs/data/hus/2011/022.pdf

employer would have expected to pay, benefits for a substantially longer amount of time than in 1984.

51.    Using the UP-84 table decreases the values of the JSAs and CLAs relative to the SLA that participants earned, thereby materially reducing the monthly benefits that retirees and beneficiaries receive in comparison to the monthly benefits they would receive if the Plan used updated, reasonable mortality assumptions.

52.    Defendant knew or should have known that the UP-84 table was outdated and unreasonable and that using it produced lower monthly benefits for participants and beneficiaries receiving a JSA or a CLA.

53.    Under  Generally  Accepted  Accounting  Principles  ("GAAP"),  mortality assumptions "should represent the 'best estimate' for that assumption as of the current measurement date."[14]  Importantly, Anheuser-Busch InBev SA/NA, the holding company that

---

[14]    As noted in a "Financial Reporting Alert" by Deloitte:

> Many entities rely on their actuarial firms for advice or recommendations related to demographic assumptions, such as the mortality assumption. Frequently, actuaries recommend published tables that reflect broad-based studies of mortality. Under ASC 715-30 and ASC 715-60, each assumption should represent the "best estimate" for that assumption as of the current measurement date. The mortality tables used and adjustments made (e.g., for longevity improvements) should be appropriate for the employee base covered under the plan. Last year, the Retirement Plans Experience Committee of the Society of Actuaries (SOA) released a new set of mortality tables (RP-2014) and a new companion mortality improvement scale (MP-2014). Further, on October 8, 2015, the SOA released an updated mortality improvement scale, MP-2015, which shows a decline in the recently observed longevity improvements. Although entities are not required to use SOA mortality tables, the SOA is a leading provider of actuarial research, and its mortality tables and mortality improvement scales are widely used by plan sponsors as a starting point for developing their mortality assumptions. Accordingly, it is advisable for entities, with the help of their actuaries, to (1) continue monitoring the

owns Defendant and its affiliates, uses up-to-date actuarial assumptions when calculating pension

plan costs in its audited financial statements that it prepares with the assistance of an independent

auditor. It filed audited financial statements prepared in accordance with GAAP with the SEC in

on Form 20-f ("20-f") for the year ending December 31, 2014 which provides:

> Actuarial assumptions are established to anticipate future events and are used in
> calculating pension and other long-term employee benefit expense and liability. These
> factors include assumptions with respect to interest rates, rates of increase in health care
> costs, rates of future compensation increases, turnover rates, and life expectancy.[15]

54.     Moreover, Anheuser-Busch InBev SA/NA used "weighted average

assumptions…in computing the benefit obligations of the company's significant plans at the

balance sheet date" that the life expectancy for a 65-year old male in the United States was 85

years, and the life expectancy for a 65-year old female in the United States was 88 years,[16] tracking

the life expectancies in the RP-2014 mortality table released by the Society of Actuaries in 2014.

55.     The UP-84 table, which is a unisex table, assumes that 65-year old males and

females will live to only age 80. Accordingly, in the audited financial statements, Anheuser-Busch

InBev SA/NA reasonably assumed that men would live 5 years longer and women would live 8

years longer than Defendant did in calculating the amount payable for Alternate Annuity Benefits.

---

> availability of updates to mortality tables and experience studies and (2)
> consider whether these updates should be incorporated in the current-year
> mortality assumption.

*See* Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement
Benefits, Financial Reporting Alert 15-4, October 30, 2015 at 3.
https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/ASC/FRA/2015/us-aers-
fra-financial-reporting-considerations-related-to-pension-and-other-postretirement-benefits-
103015.pdf
[15]     *See* Anheuser-Busch InBev SA/NV's Form 20-f for year ending December 31, 2014 at F-
21, available at: https://www.ab-inbev.com/content/dam/universaltemplate/ab-
inbev/investors/reports-and-filings/sec-filings/20F_24032015.pdf
[16]     *Id.* at F-47.

56.     Anheuser-Busch InBev SA/NA used reasonable actuarial assumptions to report a greater liability for benefits than A-B was paying out using the unreasonable UP-84 table. There is no reasonable justification for A-B to use an old mortality table that presumes an early death and an early end to benefit payments in order to calculate an unfairly low annual benefit for participants, while at the same time using a reasonable mortality table to project a longer duration of these very same annual benefit payments for annual financial reporting.

57.     Since these two analyses measure the length of the very same lives and the very same benefit streams, they should use the same mortality assumptions. "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit; rather we stated, 'If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. Price WaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) *quoting*, *Edsen v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000).

58.     Although A-B used updated mortality assumptions to calculate the present value of benefits under the Plan for its shareholders, A-B knowingly and wrongfully used the UP-84 table that is several decades out-of-date to convert the SLAs to JSAs and CLAs under the Plan. A-B has used the same actuarial assumptions since at least 2001 to calculate JSAs and CLAs even though the UP-84 fails to reflect the improvements in life expectancies.

59.     A-B knowingly misrepresented to participants that the JSAs and CLAs were actuarially equivalent to the SLAs to reduce the amount of benefits they were obligated to pay retirees who selected a JSA or a CLA.

60.     During the relevant period, A-B's use of the UP-84 table to calculate JSAs and CLAs was unreasonable.

61.     Had the Plan used reasonable actuarial assumptions, such as the Treasury Assumptions, Plaintiff and other participants and beneficiaries would have received, and would continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

62.     The chart below compares the amount that a Plan participant who is 65-years old (with a 65-year-old spouse) who accrued an SLA of $1,000/month would receive per month if she elected to receive her benefits in the form of a 10YCLA or a 50% JSA, using the 2018 Treasury Assumptions and the Plan's actuarial assumptions:

|  | 2018 Treasury Assumptions | UP-84/6.5% | UP-84/7% |
|---|---|---|---|
| SLA | $1,000 | $1,000 | $1,000 |
| 5YCLA | $993.07 | $973.85 | $973.42 |
| 10 YCLA | $972.62 | $911.32 | $911.12 |
| 50% JSA | $926.67 | $902.44 | $904.74 |
| 100% JSA | $863.36 | $822.22 | $826.05 |

63.     While the amount of the differences between the 2018 Treasury Assumptions and the assumptions that A-B uses under the Plan will vary depending on the ages of the participant and the beneficiary, *all* participants and beneficiaries who receive a JSA or a CLA under the Plan are not receiving an actuarially equivalent form of benefit because the present value is not equal to that of the SLA that they earned.

64.     Plaintiff retired at age 65 when his wife was 63 years and 11 months old and accrued a SLA in the amount of $1,021.64.  He is receiving a 50% JSA under the BEC Sub-Plan in the amount of $916.31.  If the applicable Treasury Assumptions were applied, Plaintiff's

benefit would be $940.92, or $24.61 more each month.  By using the UP-84 and a 6.5% interest rate, A-B reduced the present value of Plaintiff's benefits at the time of his retirement by $4,385.50.

65.     Discovery will likely show that Defendant's use of unreasonable actuarial assumptions deprived retirees and their spouses of tens of millions of dollars.

66.     Because each of the Sub-Plans use a grossly outdated, unreasonable mortality table throughout the relevant time period, the benefits paid to participants and beneficiaries who receive, and continue to receive, JSAs and CLAs are not actuarially equivalent to what they would have received if they had selected an SLA, in violation of ERISA. § 205(d)(1)(B), 29 U.S.C. § 1055(d)(1)(B) and ERISA § 205(d)(2)(A), 29 U.S.C. § 1055(d)(2)(A).     Rather, the benefits payable under JSAs and CLAs are much lower than they should be.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the class (the "Class") defined as follows:

> All participants and beneficiaries of the Plan who are receiving a joint and survivor annuity or a life and certain annuity.  Excluded from the Class are Defendant and any individuals who are subsequently to be determined to be fiduciaries of the Plan.

68.     The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of persons.

69.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims and the claims of all Class members arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by Defendant's wrongful conduct.

70.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class Members.  Common legal and factual questions include, but are not limited to:

        A.     Whether the Plan's formulae for calculating JSAs and CLAs provide benefits that are truly actuarially equivalent to those that would be paid under an SLA;

        B.     Whether the Plan's actuarial assumptions are reasonable;

        C.     Whether the Plan  should be reformed to comply with ERISA; and

        D.     Whether Plaintiff and Class Members should receive additional benefits.

71.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiff has no interests antagonistic to those of other members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

72.     This action may be properly certified under either subsection of Rule 23(b)(1). Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant.  Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

73.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

74.     In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**FIRST CLAIM FOR RELIEF**
**Declaratory and Equitable Relief**
**(ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))**

75.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

76.     The Plan improperly reduces annuity benefits for participants who receive either a JSA or a CLA below the benefits that they would receive if those benefits were actuarially equivalent to a SLA as ERISA requires.

77.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

78.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief, determining that the Plan's established methodologies for calculating actuarial equivalence of JSAs and CLAs violates ERISA because they do not provide actuarially equivalent benefits.  By not providing actuarially equivalent

benefits, Defendant has violated ERISA's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a).

79.     Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

        (a)     re-calculation and correction of benefits previously paid JSAs and CLAs;

        (b)     an "accounting" of all prior benefits and payments;

        (c)     a surcharge;

        (d)     disgorgement of amounts wrongfully withheld;

        (e)     disgorgement of profits earned on amounts wrongfully withheld;

        (f)     a constructive trust;

        (g)     an equitable lien;

        (h)     an injunction against further violations; and

        (i)     other relief the Court deems just and proper.

### SECOND CLAIM FOR RELIEF
**For Reformation of the Plan and Recovery of Benefits Under the Reformed Plan
(ERISA § 502(a)(1), 29 U.S.C. § 1132(a)(1))**

80.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

81.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

82.     The Plan improperly reduces annuity benefits for participants who receive JSAs and CLAs below the benefits that they would receive if those benefits were actuarially equivalent

to an SLA as ERISA requires. By not providing actuarially equivalent benefits, Defendant has violated ERISA's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a).

83.     Plaintiff is entitled to reformation of the Plan to require Defendant to provide actuarially equivalent benefits.

84.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

85.     Plaintiff seeks to recover actuarially equivalent benefits, to enforce his rights to the payment of past and future actuarially equivalent benefits, and to clarify his rights to future actuarially equivalent benefits, under the Plan following reformation.

## THIRD CLAIM FOR RELIEF
### Breach of Fiduciary Duty
#### (ERISA §§ 1104 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))

86.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

87.     A-B is the Plan Administrator and the Plan's named fiduciary of the Plan.

88.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or

discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

89.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan insofar as the Plan is consistent with ERISA.

90.     The Plan is not consistent with ERISA because it uses the outdated UP-84 mortality table to calculate JSAs and CLAs. As a result, the Plan's calculation of JSAs and CLAs produces results that are not actuarially equivalent resulting in participants and beneficiaries illegally forfeiting and losing vested benefits in violation of ERISA.

91.     In following the Plan, which did not conform with ERISA, A-B breached its fiduciary duties.

92.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

93.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief, determining that the Plan's established methodologies for calculating actuarial equivalence of JSAs and CLAs violates ERISA because it does not provide an actuarially equivalent benefit.

94.     Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

      (a)      re-calculation, correction, and payments of benefits actuarially equivalent to JSAs and CLAs;

      (b)      an "accounting" of all prior benefits and payments;

      (c)      a surcharge;

      (d)      disgorgement of amounts wrongfully withheld;

      (e)      disgorgement of profits earned on amounts wrongfully withheld;

      (f)      a constructive trust;

      (g)      an equitable lien;

      (h)      an injunction against further violations; and

      (i)      other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendant on all claims and requests that the Court awards the following relief:

A.      Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Declaring that the Plan fails to properly calculate and pay JSAs and CLAs that are actuarially equivalent to the SLA, in violation of ERISA;

C.      Ordering Defendant to bring the Plan into compliance with ERISA, including, but not limited to, reforming the Plan to bring it into compliance with ERISA with respect to calculating actuarially equivalent JSAs and CLAs;

D.      Ordering Defendant to correct and recalculate benefits that have been paid;

E.      Ordering Defendant to provide an "accounting" of all prior payments of benefits under the Plan to determine the proper amounts that should have been paid;

F.      Ordering Defendant to pay all benefits improperly withheld, including under the theories of surcharge and disgorgement;

G.      Ordering Defendant to disgorge any profits earned on amounts improperly withheld;

H.      Imposition of a constructive trust;

I.      Imposition of an equitable lien;

J.      Reformation of the Plan;

K.      Ordering Defendant to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

L.      Ordering Defendant to pay future benefits in accordance with the terms of the Plan, as reformed.

M.      Awarding, declaring, or otherwise providing Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper, and such appropriate equitable relief as the Court may order, including an accounting, surcharge, disgorgement of profits, equitable lien, constructive trust, or other remedy;

N.      Awarding to Plaintiff's counsel attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O.      Any other relief the Court determines is just and proper.


Dated:  May 6, 2019                          Respectfully submitted,


                                             *Mark G. Boyko*
                                             Mark G. Boyko (MO Bar #57318)
                                             **BAILEY & GLASSER LLP**
                                             8012 Bonhomme Ave., Suite 300

Clayton, MO 63105
Tel: (314) 863-5446
Fax: (314) 863-5483
Email: mboyko@baileyglasser.com

**BAILEY & GLASSER LLP**
Gregory Y. Porter (to be admitted *pro hac vice*)
1055 Thomas Jefferson Street, NW, Suite 540
Washington, DC 20007
Tel: (202) 463-2101
Fax: (202) 463-2103 fax
Email: gporter@baileyglasser.com

**IZARD, KINDALL & RAABE LLP**
Robert A. Izard (to be admitted *pro hac vice*)
Mark P. Kindall (to be admitted *pro hac vice*)
Douglas P. Needham (to be admitted *pro hac vice*)
Seth R. Klein (to be admitted *pro hac vice*)
29 South Main Street, Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290
Email:  rizard@ikrlaw.com
Email:  mkindall@ikrlaw.com
Email:  dneedham@ikrlaw.com
Email: sklein@ikrlaw.com

*Counsel for Plaintiffs*